THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (SBN 168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858-794-1441
Facsimile: 858-794-1450
Email: kah@weiserlawfirm.com

Attorneys for Plaintiff

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE C. FARMER, JR., Derivatively On Behalf of QUESTCOR PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. THOMPSON, MITCHELL J. BLUTT, NEAL C. BRADSHER, STEPHEN C. FARRELL, LOUIS E. SILVERMAN and SCOTT M. WHITCUP, <br><br> Defendants, <br><br> – and – <br><br> QUESTCOR PHARMACEUTICALS, INC., a California Corporation, <br><br> Nominal Party. | Case No. **SACV 12 - 02019 DOC (RNBx)** <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT |

*Paid 2/5-21*

BY
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
2012 NOV 20 AM 11: 46
FILED

**NATURE OF THE ACTION**

1. Plaintiff Clarence C. Farmer, Jr. ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Gross Mismanagement, Abuse of Control, and Unjust Enrichment (the "Complaint") for the benefit of nominal defendant Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2. According to its public filings, Questcor is a biopharmaceutical company that provides prescription drugs for the treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications. It primarily offers H.P. Acthar Gel ("Acthar"), an injectable drug for the treatment of acute exacerbations of multiple sclerosis ("MS") in adults; to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus; and as monotherapy for the treatment of infantile spasms in infants and children under two years of age. The company's H.P. Acthar Gel also focuses on rheumatology-related conditions, including collagen diseases and rheumatic disorders. In addition, it offers Doral for the treatment of insomnia. The company sells its Acthar primarily to specialty pharmacies; and Doral to pharmaceutical wholesalers.

3. Throughout the relevant time period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, defendants disseminated false and misleading statements about the effectiveness of Acthar as a treatment for MS and nephrotic syndrome, making it impossible for the public to gain a meaningful or realistic understanding of the drug's prospects and market success.

4. As a result of defendants' false statements, Questcor's stock traded at artificially inflated prices, reaching a relevant time period high of $57.64 per share on July 9, 2012.

- 1 -

1      5.      On September 19, 2012, Citron Research ("Citron") reported that Aetna

2  Inc. ("Aetna"), one of the nation's largest insurers, had recently revised its policy

3  concerning Acthar, which would severely limit coverage of Questcor's primary drug.

4  Aetna had engaged in a review of the 19 indications for which the U.S. Food and Drug

5  Administration ("FDA") had approved Acthar.  Based upon its findings, Aetna

6  determined that clinical research supported only one of the 19 indications.  In Aetna's

7  clinical policy bulletin issued in connection with its review, Aetna reported that

8  studies suggested that the drug is only "medically necessary" for West syndrome, a

9  rare condition that causes infantile spasms, and not for other indications, such as MS,

10  which are treated with steroids.  Typically, Aetna only reimburses for drugs when they

11  are deemed medically necessary.  According to an Aetna spokesperson, "'Our

12  previous position was that this was a last-resort treatment. . . We now state that it is

13  not medically necessary because there is no clinical evidence that the drug is more

14  effective than steroids.'"

15      6.      On this news, Questcor's stock plummeted $24.17 per share to close at

16  $26.35 per share on September 19, 2012, a one-day decline of *48%*.

17      7.      Then, on September 24, 2012, defendants caused the Company to

18  announce in a Form 8-K filed with the SEC that the U.S. government had initiated an

19  investigation into the Company's promotional practices.

20      8.      On this news, Questcor's stock dropped another $11.05 per share to close

21  at $19.08 per share on September 24, 2012, a one-day decline of *37%*.

22      9.      The true facts, which were known by the defendants but concealed from

23  the investing public, were as follows:

24           (a)     Defendants lacked clinical evidence to support the use of Acthar

25  for indications other than infantile spasms;

26           (b)     Defendants had engaged in questionable tactics to promote the sale

27  and use of Acthar in the treatment of MS and nephrotic syndrome; and

28

1        (c)    Defendants lacked a reasonable basis to make positive statements

2    about the Company or its outlook, including statements about the effectiveness of and

3    potential market growth for Acthar.

4        10.    As a result of defendants' false and misleading statements, Questcor's

5    stock traded at artificially inflated levels. However, after the above revelations seeped

6    into the market, the Company's shares were hammered by massive sales, sending

7    them down over **67%** from their relevant time period high.

8        11.    Further, as a result of defendants' breaches, the price of the Company's

9    stock still has not recovered and currently trades for around $24 per share.

10                  **JURISDICTION AND VENUE**

11        12.    This Court has jurisdiction over this action pursuant to 28 U.S.C.

12    §1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or

13    countries and the matter in controversy exceeds $75,000.00, exclusive of interests and

14    costs. This Court has supplemental jurisdiction over the state law claims asserted

15    herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer

16    jurisdiction on a court of the United States which it would not otherwise have.

17        13.    Venue is proper in this district because a substantial portion of the

18    transactions and wrongs complained of herein, including defendants' primary

19    participation in the wrongful acts detailed herein, occurred in this district. One or

20    more of the defendants either resides in or maintains executive offices in this district,

21    and defendants have received substantial compensation in this district by engaging in

22    numerous activities and conducting business here, which had an effect in this district.

23    Additionally, nominal defendant Questcor is headquartered in this district.

24                      **THE PARTIES**

25        14.    Plaintiff is a shareholder of Questcor and has continuously held Questcor

26    stock since April 2011. Plaintiff is a citizen of Pennsylvania.

27        15.    Nominal defendant Questcor is a California corporation with its

28    executives offices located at 1300 Kellogg Drive, Suite D, Anaheim, CA 92807.

1   According to its public filings, the Company provides prescription drugs for the
2   treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications.

3       16.   Defendant Don M. Bailey ("Bailey") has served as the Chief Executive
4   Officer ("CEO") and President of the Company since November 2007. In addition,
5   defendant Bailey served as the Interim President of the Company from May 2007 to
6   November 2007. Further, defendant Bailey has served as a director of the Company
7   since May 2006. Upon information and belief, defendant Bailey is a citizen of
8   California.

9       17.   Defendant Michael H. Mulroy ("Mulroy") has served as the Chief
10  Financial Officer ("CFO") of Company since January 2011. Upon information and
11  belief, defendant Mulroy is a citizen of California.

12      18.   Defendant Stephen L. Cartt ("Cartt") has served as the Chief Operating
13  Officer ("COO") of Company since March 2005. Upon information and belief,
14  defendant Cartt is a citizen of California.

15      19.   Defendant David Young ("Young") has served as the Chief Scientific
16  Officer ("CSO") of the Company since October 2009. Upon information and belief,
17  defendant Young is a citizen of California.

18      20.   Defendant Virgil D. Thompson ("Thompson") has served as a director of
19  the Company since January 1996. In addition, defendant Thompson has served as a
20  member of the Board's Audit Committee (the "Audit Committee") and as Chairman
21  of the Board during the relevant time period. Further, defendant Thompson has
22  served as a member of the Board's Compliance Committee (the "Compliance
23  Committee") during the relevant time period. Upon information and belief, defendant
24  Thompson is a citizen of California.

25      21.   Defendant Mitchell J. Blutt ("Blutt") has served as a director of the
26  Company since July 2010. In addition, defendant Blutt has served as a member of the
27  Audit Committee during the relevant time period. Upon information and belief,
28  defendant Blutt is a citizen of New York.

- 4 -

22.   Defendant Neal C. Bradsher ("Bradsher") has served as a director of the Company since March 2004.  Upon information and belief, defendant Bradsher is a citizen of New York.

23.   Defendant Stephen C. Farrell ("Farrell") has served as a director of the Company since November 2007.  In addition, defendant Farrell has served as the Chairman of the Audit Committee during the relevant time period.  Further, defendant Farrell has served as a member of Compliance Committee during the relevant time period.  Upon information and belief, defendant Farrell is a citizen of Florida.

24.   Defendant Louis E. Silverman ("Silverman") has served as a director of the Company since December 2009.  Upon information and belief, defendant Silverman is a citizen of California.

25.   Defendant Scott M. Whitcup ("Whitcup") has served as a director of the Company since February 2012.  Upon information and belief, defendant Whitcup is a citizen of California.

26.   Collectively, defendants Bailey, Mulroy, Cartt, Young, Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup shall be referred to herein as the "Defendants."

27.   Collectively, defendants Thomson, Blutt, and Farrell shall be referred to herein as the "Audit Committee Defendants."

28.   Collectively, defendants Whitcup, Farrell, and Thompson shall be referred to herein as the "Compliance Committee Defendants."

## DEFENDANTS' DUTIES

29.   By reason of their positions as officers, directors, and/or fiduciaries of Questcor and because of their ability to control the business and corporate affairs of Questcor, Defendants owed Questcor and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Questcor in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Questcor and its

1    shareholders so as to benefit all shareholders equally and not in furtherance of their

2    personal interest or benefit. Each director and officer of the Company owes to

3    Questcor and its shareholders the fiduciary duty to exercise good faith and diligence in

4    the administration of the affairs of the Company and in the use and preservation of its

5    property and assets, and the highest obligations of fair dealing.

6        30.    Defendants, because of their positions of control and authority as

7    directors and/or officers of Questcor, were able to and did, directly and/or indirectly,

8    exercise control over the wrongful acts complained of herein. Because of their

9    advisory, executive, managerial, and directorial positions with Questcor, each of the

10   Defendants had knowledge of material non-public information regarding the

11   Company.

12       31.    To discharge their duties, the officers and directors of Questcor were

13   required to exercise reasonable and prudent supervision over the management,

14   policies, practices and controls of the Company. By virtue of such duties, the officers

15   and directors of Questcor were required to, among other things:

16           (a)    Exercise good faith to ensure that the affairs of the Company were

17   conducted in an efficient, business-like manner so as to make it possible to provide the

18   highest quality performance of their business;

19           (b)    Exercise good faith to ensure that the Company was operated in a

20   diligent, honest and prudent manner and complied with all applicable federal and state

21   laws, rules, regulations and requirements, and all contractual obligations, including

22   acting only within the scope of its legal authority; and

23           (c)    When put on notice of problems with the Company's business

24   practices and operations, exercise good faith in taking appropriate action to

25   correct the misconduct and prevent its recurrence.

26       32.    Pursuant to the Audit Committee's Charter, the members of the Audit

27   Committee are required, *inter alia*, to:

28

       (a)    Review and discuss the Company's quarterly financial statements with management;

       (b)    Discuss with management the Company's earnings press releases;

       (c)    Discuss with management any of the following, which are brought to the Audit Committee's attention: correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies;

       (d)    Discuss with management and outside counsel any legal matters brought to the Audit Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements;

       (e)    Discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures; and

       (f)    Regularly report to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or any other matter the Audit Committee determines is necessary or advisable to report to the Board.

33.    Pursuant to the Compliance Committee's charter, the members of the Compliance Committee are required, *inter alia*, to:

       (a)    Review and oversee the Company's Compliance Program, including but not limited to, evaluating its effectiveness and receiving updates about the activities of the Chief Compliance Officer and other compliance personnel;

       (b)    Review the status of the Company's compliance with relevant laws, regulations, and internal procedures (*e.g.*, compliance with U.S. federal healthcare program requirements; compliance with U.S. pharmaceutical product promotional rules and regulations, including with respect to "off-label" and other product promotional activities, unapproved product uses, fair balance, product safety

1   claims, and product superiority or efficacy claims; product manufacturing quality
2   control; clinical studies quality control; and required reporting to the Food and Drug
3   Administration);

4         (c)    Review and evaluate internal reports and external data to assess
5   whether there are significant concerns regarding the Company's regulatory and/or
6   compliance practices; and

7         (d)    Report at least annually to the Board on (i) the state of the
8   Company's compliance functions, (ii) relevant compliance issues involving the
9   Company of which the Committee has been made aware, including a summary of the
10   results of any compliance investigations conducted by the Company, (iii) any potential
11   patterns of non-compliance identified within the Company, (iv) any significant
12   disciplinary actions against any compliance personnel, and (v) any other issues that
13   may reflect any systemic or widespread problems in compliance or regulatory matters
14   exposing the Company to substantial compliance risk.

**SUBSTANTIVE ALLEGATIONS**

**A.   Background of the Company**

17       34.    According to its public filings, Questcor is a single product company,
18   with Acthar accounting for nearly all of its revenue.  Acthar, a highly specialized,
19   low-volume, premium-priced drug, was originally approved by the FDA in 1952.  The
20   injectable hormone has a broad label, as it has been approved by the FDA for use in
21   19 indications.  Acthar is a first-line treatment for infantile spasms, a rare, terrible
22   seizure disorder that affects around 1,500 babies a year in the U.S.  Acthar was
23   approved for the treatment of MS relapse in 1978.  It was used extensively as a
24   treatment for MS in the 1970s, but was largely abandoned in the 1980s after
25   corticosteroids came on the market, as the powerful steroids proved to be a superior
26   alternative to Acthar.

27       35.    According to its public filings, Questcor acquired the rights to Acthar in
28   2001 for $100,000.  At the time, Acthar was almost exclusively being used to treat

1   infantile spasms. In 2007, Defendants caused Questcor to file an application with the
2   FDA to obtain orphan drug status for Acthar for the treatment of infantile spasms.
3   The FDA grants orphan status to a drug that treats a disease affecting fewer than
4   200,000 people. Orphan status provides a company with seven years of marketing
5   exclusivity. At the same time Defendants filed the Company's application with the
6   FDA, Questcor raised the price of Acthar from $1,650 per vial to $23,000 per vial,
7   which represents an overnight increase of over 1300%. As a result of the significant
8   price increase, 2007 was the first year in the history of the drug that Acthar made
9   money. The FDA approved Questcor's orphan drug status application in October
10  2010.

11      36.     Soon after Defendants enacted the tremendous price hike, Questcor,
12  under Defendants' direction, embarked on an aggressive strategy to transform Acthar
13  into a blockbuster drug. Defendants' sole strategic goal was to promote Acthar and
14  expand the use of the drug for other indications, initially focusing on using Acthar for
15  the treatment of MS beginning at the end of 2007, followed by nephrotic syndrome in
16  the first quarter of 2011. Questcor markets Acthar as a second line treatment for MS
17  after patients are not responsive to steroids and markets Acthar as a first-line treatment
18  for nephrotic syndrome

19      37.     As a result of Defendants' new strategy, the Company grew
20  tremendously, with its net sales increasing from $49.8 million in 2007 to $218.2
21  million in 2011. The main source of the Company's growth is the use of Acthar in the
22  treatment of MS and nephrotic syndrome. Currently, infantile spasms, the condition
23  for which it received orphan drug status, accounts for only 6%-10% of the Company's
24  revenues.

25  **B.     Defendants' False and Misleading Statements**

26      38.     On April 26, 2011, Defendants caused the Company to issue a press
27  release announcing its first quarter 2011 financial results. Defendants reported net
28

1   income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of
2   $36.8 million for the first quarter of 2011.  The release stated in part:

3           "Our strategy to expand the sales force is clearly paying off," said
4       Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions
5       are up sharply from last quarter. March was a particularly strong month
6       and this momentum has continued so far in April. We believe that Acthar
7       is filling an increasingly important role in the treatment of exacerbations
8       associated with MS and, looking forward, we expect to continue to grow
9       sales in this important therapeutic area."

10          Mr. Bailey added, "We are also encouraged by the early positive
11      results from our small, dedicated nephrology sales team, which initiated
12      selling efforts at the beginning of March. The number of nephrologists

13      39.    After issuing its first quarter 2011 financial results on April 26, 2011,
14  Defendants hosted a conference call for analysts, media representatives and investors.
15  During the call, Defendants reiterated the record financial results reported in the
16  Company's press release and defendant Mulroy discussed the Company's financial
17  performance in depth.   Defendants Bailey and Cartt further presented prepared
18  statements at the conference call and represented as follows:

19          [BAILEY:] In summary, we are off to a very good start this year
20      as we continue to execute our straightforward strategy to sell more
21      Acthar. Our decision to expand the MS sales force is clearly paying off.
22      Also, our nephrotic syndrome sales force is having some early success.
23                          *       *       *

24          We believe this MS sales performance reflects the strong,
25      underlying demand for Acthar. This growth in demand is being driven by
26      the increasing productivity of our expanded sales force. We believe net
27      sales in the MS market are now about 60% of total Acthar net sales.
28                          *       *       *

- 10 -

[CARTT:] Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter. We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

\*     \*     \*

Our promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients and two, helping doctors, nurses and others in their medical practice become more effective at identifying potential Acthar patients.

\*     \*     \*

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs. In these programs existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses.

When combined with follow up sales calls, these programs appear to be a key driver of our sales growth. Recently we've been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

40.     On July 26, 2011, Defendants caused the Company to issue a press release announcing its second quarter 2011 financial results. Defendants reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011. The release stated in part:

- 11 -

1       "Clearly, Questcor had a terrific quarter," said Don M. Bailey,
2       President and CEO of Questcor. "Our focus on expanding the use of
3       Acthar in the treatment of MS exacerbations drove our record second
4       quarter financial performance. Importantly, in spite of the rapid
5       expansion in the use of Acthar for MS exacerbations, we believe that the
6       prescriber base can continue to grow. Accordingly, growing MS sales
7       remains our number one priority. Also, following our early success in
8       nephrotic syndrome, we are immediately and substantially expanding our
9       nephrology selling effort."

10      41.     After issuing its second quarter 2011 financial results on July 26, 2011,
11  Defendants hosted a conference call for analysts, media representatives and investors.
12  During the call, Defendants reiterated the record financial results reported in the
13  Company's press release and defendant Mulroy discussed the Company's financial
14  performance in depth. Defendants Bailey, Cartt and Young further presented prepared
15  statements at the conference call and represented as follows:

16      [CARTT:] During the quarter we shipped a record 751 paid
17      Acthar prescription for the treatment of MS relapses. This was an
18      increase of 147% over the year-ago period, and 48% over the previous
19      quarter. We believe this performance is a strong signal that the sales
20      force continues to gain traction in the MS market at a faster rate than we
21      expected. In addition to rapid growth, our trends at MS are all very good
22      and indicate that we are building momentum in this key Acthar market.

23                          *      *      *

24      So, let's summarize. We are very pleased with the robust MS
25      prescription growth during the quarter and expect continued growth
26      during 2011 and into 2012 as a result of the continued sustained sales
27      call activity. Our early prescription trends in nephrology are surprisingly
28      strong and we are quickly expanding our sales capability in MS, which

will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

\*       \*       \*

[BAILEY:] Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets, MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.

Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts. We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

42.    On October 25, 2011, Defendants caused the Company to issue a press release announcing its third quarter 2011 financial results. Defendants reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011. The release stated in part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key

- 13 -

1        Acthar market," commented Steve Cartt, Executive Vice President and

2        Chief Business Officer. "Furthermore, during the third quarter we

3        completed the expansion of our Nephrology Sales Force from 5 to 28

4        representatives, with all new personnel being fully trained and making

5        initial sales calls by October 1st. Despite the inherent disruption involved

6        with this expansion, paid nephrotic syndrome Acthar prescriptions

7        increased during the quarter. September was a particularly strong month

8        for both MS and NS sales."

9        43.    After issuing its third quarter 2011 financial results on October 25, 2011,

10 Defendants hosted a conference call for analysts, media representatives and investors.

11 During the call, Defendants reiterated the record financial results reported in the

12 Company's press release and defendant Mulroy discussed the Company's financial

13 performance in depth.  Defendants Bailey and Cartt further presented prepared

14 statements at the conference call and represented as follows:

15        [CARTT:] [W]e shipped 886 paid Acthar prescription for the

16        treatment of MS relapses during the third quarter of 2011. This was an

17        increase of 174% over the year-ago period. In addition to strong script

18        growth, other positive trends in our MS business indicate that we are

19        building momentum in this key Acthar market.

20                 *    *    *

21        Switching gears to the subject of new scientific data, several

22        Acthar-related abstracts will be presented in November at the annual

23        meeting of the America Society of Nephrology, or ASN, held this year in

24        Philadelphia. These abstracts are available on ASN's website, www.asn-

25        online.org.The new data provides further insight into the immune-

26        modulating and other therapeutic properties of Acthar specifically

27        relating to kidney disease.

28

1         We believe availability of this data provides further evidence for

2    the direction [sic] action of Acthar on kidney disease. Importantly, the

3    first three abstracts shown may specifically enhance our near-term

4    selling efforts in nephrology. Our emerging understanding of the

5    apparent immune-modulating properties of Acthar is also beginning to

6    encourage us to investigate the potentially broader therapeutic

7    applications of Acthar in other inflammatory and autoimmune diseases,

8    many of which are already on the product label for Acthar.

9        44.    On January 11, 2011, *TheStreetSweeper.org* (*"Streetsweeper"*)

10   announced that it had initiated a short position in Questcor. *StreetSweeper* further

11   reported that it intended to issue the first article in a two-part investigative series about

12   Questcor in the following week. According to *StreetSweeper*:

13        The first article raises serious questions about the aggressive

14   marketing practices that [Questcor] has used to generate explosive – but

15   potentially unsustainable – growth in prescriptions for its only drug

16   while the second story further examines QCOR's business practices,

17   while taking a hard look at the leaders who have struck it rich as a result

18   of the company's controversial growth strategy.

19       45.    Thereafter, Defendants went to extensive lengths to refute the claims

20   raised by *StreetSweeper* and defend the Company's business practices. As a result,

21   Questcor's stock continued to be artificially inflated.

22       46.    For instance, on January 11, 2012, Defendants caused the Company to

23   issue a press release entitled "Questcor Pharmaceuticals Issues Statement," which

24   stated in part:

25        Questcor Pharmaceuticals, Inc. today announced it became aware

26   that an investor blog is preparing to issue a report regarding the

27   Company's marketing and business practices. Questcor issued the

28   following statement:

1          The Company believes that its marketing and business practices
2     are consistent with regulatory requirements and industry standard
3     practices. Questcor markets H.P. Acthar® Gel for the treatment of acute
4     exacerbations of multiple sclerosis (MS) in adults, the treatment of
5     nephrotic syndrome, and the treatment of infantile spasms in children
6     under two years of age. The Company maintains a compliance program,
7     which is led by an experienced compliance officer and includes the
8     active participation of Questcor's executive management team. Questcor
9     attributes its success to the ability of Acthar to potentially address the
10    unmet medical need associated with MS exacerbations and nephrotic
11    syndrome. The Company is committed to providing access to Acthar to
12    patients who need it, and marketing Acthar in accordance with
13    regulatory requirements and industry standard practices. Questcor plans
14    to speak with the publication to discuss the Company and its marketing
15    and business practices.

16    47.    On February 22, 2012, Defendants caused the Company to issue a press
17    release announcing its fourth quarter and full year 2011 financial results. Defendants
18    reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5
19    million for the fourth quarter of 2011. Additionally, Defendants reported net income
20    of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million for fiscal year
21    2011. The release stated in part:

22          "Net sales growth in the fourth quarter was driven by the
23    increasing numbers of physicians who are recognizing the potential for
24    Acthar to help patients with MS and NS," said Don M. Bailey, President
25    and CEO of Questcor. "We are particularly encouraged by the growing
26    number of physicians who recognize the therapeutic value of Acthar in
27    their practices, especially for those patients who have not adequately
28    responded to other treatments."

- 16 -

48.     After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Defendants hosted a conference call for analysts, media representatives and investors.  During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:] As we look ahead to 2012 and beyond, we believe we can sustainably grow our Business due to three key factors. First, Acthar provides benefits to many difficult to treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plan. Our focus remains on helping patients with serious, difficult to treat medical conditions.

\*        \*        \*

A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS. In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth – positive patient outcome; increasing awareness among neurologists about how best to incorporate Acthar into their practices; continued excellent Acthar

- 17 -

1    insurance coverage for MS relapses; and the increase in productivity of

2    our MS commercial team – all combined to generate this growth.

3                              *     *     *

4    We believe that because Acthar provides real and substantial

5    benefits to many patients who would otherwise continue to suffer the

6    effects of serious, difficult-to-treat disorders, our growth should be

7    sustainable. We are expanding the Organization and associated

8    infrastructure to address the significant growth opportunities in front of

9    us. At the same time, we are off to a good start to 2012, with January

10   MS, NS, and IS paid prescription each having a good month.

11   49.    On April 24, 2012, Defendants caused the Company to issue a press

12   release announcing its first quarter 2012 financial results. Defendants reported net

13   income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million for the

14   first quarter of 2012. The release stated in part:

15   "While our substantial NS commercial effort only began in the

16   fourth quarter of 2011, the value of NS shipped prescriptions now

17   exceeds that of MS," said Don M. Bailey, President and CEO of

18   Questcor. "This faster-than-expected NS growth drove us to further

19   expand the NS commercial effort prior to the additional expansion of our

20   MS commercial team."

21   50.    After issuing its first quarter 2012 financial results on April 24, 2012,

22   Defendants hosted a conference call for analysts, media representatives and investors.

23   During the call, Defendants reiterated the record financial results reported in the

24   Company's press release and defendant Mulroy discussed the Company's financial

25   performance in depth. Defendants Bailey, Cartt and Young further presented prepared

26   statements at the conference call and represented as follows:

27   [BAILEY:] Questcor's unconventional but simple business model

28   continues to produce excellent financial results. Shift files, net sales and

- 18 -

earnings were all up well over 100% year-over-year. We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar, and as a result paid prescriptions continue to increase. Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that, by our calculation, nephritic syndrome scrip value now exceeds MS.

*       *       *

[CARTT:] Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto, is being presented just this week at the Canadian nephrology society annual meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy, had their proteinuria drop by 50% or more, due to Acthar treatment.

*       *       *

[YOUNG:] As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, few other successful examples of the type

- 19 -

1    of product. Soliris and Botox come to mind, for example. We have a

2    significant opportunity with Acthar to expand use from our three existing

3    markets that Steve just discussed to other markets that are part of the list

4    of 19 approved on-label indications. In addition, as we've been learning

5    more about the pharmacology of Acthar, including how and why Acthar

6    acts differently than steroids, there are many other new indications with

7    unmet medical needs, where we and others believe Acthar could provide

8    a significant clinical benefit. Currently, we have approximately 20

9    company-sponsored pre-clinical and clinical studies ongoing, and are

10    supporting around 20 ongoing investigator-initiated studies.

11    51.    On July 9, 2012, Questcor's stock reached its relevant time period high of

12    $57.64 per share.

13    52.    On July 10, 2012, Citron issued an in-depth research report regarding

14    Questcor. Citron expanded on the *StreetSweeper* articles and further raised concerns

15    about the Company's marketing strategy and a possible generic threat to Acthar. The

16    report discussed the competitive landscape for Acthar and was critical of the

17    Company's assertions that there were significant barriers to entry into the market.

18    Citron further questioned whether there was credible scientific data to support

19    Questcor's aggressive strategy to expand the use of Acthar for indications other than

20    infantile spasms. In addition, the research report analyzed the Company's marketing

21    expenses and questioned how the drug was being marketed to doctors. The Citron

22    report further condemned Questcor for the lack of any meaningful research and

23    development being engaged in by the biopharmaceutical company. The report noted:

24    "Just the insider selling over the last year represents more cash than Questcor has

25    spent on research and development over its entire lifespan." The research report was

26    not only critical of the amount of insider selling over the past year but it was also

27    critical about its timing given the Company was buying back large amounts of

28    Company stock at the same time the insiders were selling their shares.

53.     Despite the serious allegations raised in the Citron report, Defendants continued to refute the claims and portrayed the claims as being made by a short seller.  As a result, Questcor's stock continued to be artificially inflated.

54.     On July 24, 2012, Defendants caused the Company to issue a press release announcing its second quarter 2012 financial results.  Defendants reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million for the second quarter of 2012.  The release stated in part:

> "In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey, President and CEO of Questcor.  "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists.  With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

55.     After issuing its second quarter 2012 financial results on July 24, 2012, Defendants hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

> [BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year-ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales

- 21 -

forces and started building a third sales force in Rheumatology, using the same formula that worked so well with MS and nephrotic syndrome. And, we also made good progress in both our science and compliance programs.

\* \* \*

[CARTT:] Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course; not everyone responds. But, clearly, many patients are benefiting significantly from this drug, and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

\* \* \*

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

\* \* \*

[YOUNG:] As you can see by our operating results reported in today's press release, we have been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects – our objectives are to produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond current on-label indications. Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many

1 research areas that still need to be assessed by our R&D group in order to

2 better understand ACTH in the clinical role of Acthar Gel.

3      \*   \*   \*

4    In summary, I'd like to bring you back to my initial topic on R&D

5 expansion. As we have previously reported, our R&D efforts have been

6 and are continuing to focus on three areas. First, producing additional

7 supporting data for the commercial team for on-label indications.

8 Second, expanding Acthar Gel use beyond the existing on-label

9 indications and following FDA processes. And third, our greatest

10 priority, better understanding the unique chemical, biological, and

11 clinical characteristics of Acthar Gel. Our research results from this third

12 area, thus far, suggest that developing a generic drug for Acthar Gel is

13 very challenging. All three areas of research are intended to advance the

14 science of Acthar Gel in order to further help patients with devastating

15 autoimmune and inflammatory diseases.

16 **C.**  **The Truth Begins to Emerge**

17   56.  On September 19, 2012, Citron reported that Aetna, one of the nation's

18 largest insurers, had recently revised its policy concerning Acthar, which would

19 severely limit coverage of Questcor's primary drug. Aetna had engaged in a review of

20 the 19 indications for which the FDA had approved Acthar. Based upon its findings,

21 Aetna decided that clinical research supported only one of the 19 indications. In

22 Aetna's clinical policy bulletin issued in connection with its review, Aetna reported

23 that studies suggested that the drug is only "medically necessary" for West syndrome,

24 a rare condition that causes infantile spasms, and not for other indications, such as

25 MS, that are treated with steroids. Aetna generally only reimburses for drugs when

26 they are deemed medically necessary. According to an Aetna spokesperson, "Our

27 previous position was that this was a last-resort treatment. . . . We now state that it is

28

1   not medically necessary because there is no clinical evidence that the drug is more
2   effective than steroids."

3       57.   On this news, Questcor's stock plummeted $24.16 per share to close at
4   $26.25 per share on September 19, 2012, a one-day decline of nearly 48% on high
5   volume.

6       58.   Subsequently, on September 19, 2012, Defendants caused the Company
7   to issue a press release entitled "Questcor Comments on Insurance Policy Bulletin,"
8   which stated in part:

9           The Company is continuing to review the Clinical Policy Bulletin
10          related to Acthar from Aetna Inc. ("Aetna").  Currently, the Company
11          does not believe that the bulletin represents a material change in
12          insurance coverage for Acthar by Aetna.  During 2012, Aetna has
13          accounted for approximately 5% of the Company's shipped prescriptions
14          for Acthar.  Based on its current assessment of the Clinical Policy
15          Bulletin, the Company does not believe that the bulletin will have a
16          material impact on the Company's results of operations.

17      59.   Then, on September 24, 2012, Defendants announced in a Form 8-K filed
18  with the SEC that the United States Attorney's Office for the Eastern District of
19  Pennsylvania had initiated an investigation into the Company's promotional practices.

20      60.   After this news, Questcor's stock dropped $11.05 per share to close at
21  $19.08 per share on September 24, 2012, a decline of 37% on high volume.

22      61.   The true facts, which were known by the Defendants but concealed from
23  the investing public, were as follows:

24          (a)   Defendants lacked clinical evidence to support the use of Acthar
25  for indications other than infantile spasms;

26          (b)   Defendants had engaged in questionable tactics to promote the sale
27  and use of Acthar in the treatment of MS and nephrotic syndrome; and

28

- 24 -

1          (c)     Defendants lacked a reasonable basis to make positive statements

2  about the Company or its outlook, including statements about the effectiveness of and

3  potential market growth for Acthar.

4      62.    As a result of Defendants' false and misleading statements, Questcor

5  stock traded at artificially inflated levels. However, after the above revelations seeped

6  into the market, the Company's shares were hammered by massive sales, sending

7  them down 67% from their relevant time period high.

8      63.    Further, as a result of Defendants' breaches of fiduciary duty and other

9  misconduct, the price of the Company's stock still has not recovered and currently

10  trades for around $19.40 per share.

## DERIVATIVE AND DEMAND ALLEGATIONS

12      64.    Plaintiff brings this action derivatively in the right and for the benefit of

13  Questcor to redress the breaches of fiduciary duty and other violations of law by

14  Defendants.

15      65.    Plaintiff will adequately and fairly represent the interests of Questcor and

16  its shareholders in enforcing and prosecuting its rights.

17      66.    The Board currently consists of the following seven (7) directors:

18  defendants Thompson, Bailey, Blutt, Bradsher, Farrell, Silverman, and Whitcup.

19  Plaintiff has not made any demand on the present Board to institute this action

20  because such a demand would be a futile, wasteful and useless act, for the following

21  reasons:

22          (a)    At all relevant times, defendants Thompson, Blutt, and Farrell

23  served as members of the Audit Committee. Pursuant to the Company's Audit

24  Committee Charter, the members of the Audit Committee were and are responsible

25  for, *inter alia*, reviewing the Company's annual and quarterly financial reports and

26  reviewing the integrity of the Company's internal controls. Defendants Thompson,

27  Blutt, and Farrell breached their fiduciary duties of due care, loyalty, and good faith,

28  because the Audit Committee, *inter alia*, allowed or permitted the Company to

1   disseminate false and misleading statements in the Company's SEC filings and other

2   disclosures and caused the above-discussed internal control failures, which resulted in

3   the improper marketing of Acthar.   Therefore, defendants Thompson, Blutt, and

4   Farrell each face a substantial likelihood of liability for their breach of fiduciary duties

5   and any demand upon them is futile;

6          (b)     At all relevant times, defendants Whitcup, Farrell, and Thompson

7   served as members of the Compliance Committee.   Pursuant to the Company's

8   Compliance Committee Charter, the members of the Compliance Committee were and

9   are responsible for, *inter alia*, reviewing and reporting to the Board the status of the

10   Company's compliance with relevant laws, regulations, and internal procedures

11   including compliance with U.S. pharmaceutical product promotional rules and

12   regulations. Defendants Whitcup, Farrell, and Thompson breached their fiduciary

13   duties of due care, loyalty, and good faith, because the Compliance Committee, *inter*

14   *alia*, allowed or permitted the Company to engage in the illicit promotional activities

15   described herein. Therefore, defendants Whitcup, Farrell, and Thompson each face a

16   substantial likelihood of liability for their breach of fiduciary duties and any demand

17   upon them is futile; and

18          (c)     The principal professional occupation of defendant Bailey is his

19   employment with Questcor as its CEO and President, pursuant to which he has

20   received and continues to receive substantial monetary compensation and other

21   benefits. In addition, according to the Company's Proxy Statement filed on March 30,

22   2012, Defendants have admitted that defendant Bailey is not independent.   Thus,

23   defendant Bailey lacks independence from demonstrably interested directors,

24   rendering him incapable of impartially considering a demand to commence and

25   vigorously prosecute this action.

26

27

28

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty for Disseminating False and Misleading Information

67.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Questcor disseminated accurate, truthful and complete information to its shareholders.

69.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Questcor shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

70.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duties for Failing to Maintain Internal Controls

71.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

72.   As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

1   73.   Defendants willfully ignored the obvious and pervasive problems with

2   Questcor's internal controls and practices and procedures and failed to make a good

3   faith effort to correct these problems or prevent their recurrence.

4   74.   As a direct and proximate result of the Defendants' foregoing breaches of

5   fiduciary duties, the Company has sustained damages.

6   ### COUNT III

7   **Against All Defendants for Breach of Fiduciary Duties for Failing
to Properly Oversee and Manage the Company**

8
9   75.   Plaintiff incorporates by reference and realleges each and every

10   allegation contained above, as though fully set forth herein.

11   76.   Defendants owed and owe Questcor fiduciary obligations.  By reason of

12   their fiduciary relationships, Defendants specifically owed and owe Questcor the

13   highest obligation of good faith, fair dealing, loyalty and due care.

14   77.   Defendants, and each of them, violated and breached their fiduciary

15   duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

16   78.   As a direct and proximate result of Defendants' failure to perform their

17   fiduciary obligations, Questcor has sustained significant damages, not only

18   monetarily, but also to its corporate image and goodwill.

19   79.   As a result of the misconduct alleged herein, Defendants are liable to the

20   Company.

21   80.   Plaintiff, on behalf of Questcor, has no adequate remedy at law.

22   ### COUNT IV

23   **Against All Defendants for Unjust Enrichment**

24   81.   Plaintiff incorporates by reference and realleges each and every

25   allegation set forth above, as though fully set forth herein.

26   82.   By their wrongful acts and omissions, Defendants were unjustly enriched

27   at the expense of and to the detriment of Questcor.

28

83. Plaintiff, as a shareholder and representative of Questcor, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT V

### Against All Defendants for Abuse of Control

84. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Questcor, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing Questcor to misrepresent material facts regarding its financial position and business prospects.

86. As a direct and proximate result of Defendants' abuse of control, Questcor has sustained significant damages.

87. As a result of the misconduct alleged herein, Defendants are liable to the Company.

88. Plaintiff, on behalf of Questcor, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Gross Mismanagement

89. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90. Defendants had a duty to Questcor and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Questcor.

91. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Questcor in a manner consistent with

1  the duties imposed upon them by law.  By committing the misconduct alleged herein,
2  Defendants breached their duties of due care, diligence and candor in the management
3  and administration of Questcor's affairs and in the use and preservation of Questcor's
4  assets.

5      92.    During the course of the discharge of their duties, Defendants knew or
6  recklessly  disregarded  the  unreasonable  risks  and  losses  associated  with  their
7  misconduct, yet Defendants caused Questcor to engage in the scheme complained of
8  herein  which  they  knew  had  an  unreasonable  risk  of  damage  to  Questcor,  thus
9  breaching their duties to the Company.  As a result, Defendants grossly mismanaged
10  Questcor.

11                              **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiff demands judgment as follows:

13      A.    Against all Defendants and in favor of the Company for the amount of
14  damages sustained by the Company as a result of Defendants' breaches of fiduciary
15  duties;

16      B.    Directing Questcor to take all necessary actions to reform and improve its
17  corporate governance and internal procedures to comply with applicable laws and to
18  protect  the  Company  and  its  shareholders  from  a  repeat  of  the  damaging  events
19  described herein, including, but not limited to, putting forward for shareholder vote
20  resolutions for amendments to the Company's By-Laws or Articles of Incorporation
21  and taking such other action as may be necessary to place before shareholders for a
22  vote a proposal to strengthen the Board's supervision of operations and develop and
23  implement procedures for greater shareholder input into the policies and guidelines of
24  the Board;

25      C.    Awarding to Questcor restitution from Defendants, and each of them, and
26  ordering disgorgement of all profits, benefits and other compensation obtained by the
27  Defendants;

28

1      D.    Awarding to Plaintiff the costs and disbursements of the action, including

2 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

3      E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

5     Plaintiff demands a trial by jury.

6 DATED: November 20, 2012

        THE WEISER LAW FIRM, P.C.
        KATHLEEN A. HERKENHOFF (SBN
        168562)

        *Kathleen A. Herkenhoff*

        KATHLEEN A. HERKENHOFF

        12707 High Bluff Drive, Suite 200
        San Diego, CA 92130
        Telephone: 858-794-1441
        Facsimile: 858-794-1450
        Email: kah@weiserlawfirm.com

        THE WEISER LAW FIRM, P.C.
        ROBERT B. WEISER
        BRETT D. STECKER
        JEFFREY J. CIARLANTO
        JOSEPH M. PROFY
        22 Cassatt Avenue, First Floor
        Berwyn, PA 19312
        Telephone: 610-225-2677
        Facsimile: 610-408-8062

        RYAN & MANISKAS, LLP
        KATHARINE M. RYAN
        995 Old Eagle School Road, Suite 311
        Wayne, PA 19087
        Telephone: 484/588-5516
        Facsimile: 484/450-2582

        Attorneys for Plaintiff

- 31 -

## <u>VERIFICATION</u>

I, Clarence C. Farmer, Jr., under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: __11/08/2012__                        _____
                                            Clarence C. Farmer, Jr.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV12- 2019 DOC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE C. FARMER, JR., Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC.<br><br>PLAINTIFF(S)<br><br>v.<br><br>DON M. BAILEY,<br>SEE ATTACHMENT A FOR ADD'L DEFENDANTS<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV 12 - 02019 DOC (RNBx)**<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

FOR OFFICE USE ONLY

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Kathleen A. Herkenhoff _____, whose address is The Weiser Law Firm, P.C., 12707 High Bluff Drive, # 200, San Diego, CA 92130 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: 11/20/2012

By: _____**DENISE VO**_____
                Deputy Clerk

        *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

FOR OFFICE USE ONLY

---

CV-01A (10/11)                                         SUMMONS

ATTACHMENT "A" TO SUMMONS  (Defendants)

Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Neal C. Bradsher, Stephen C. Farrell, Louis E. Silverman and Scott M. Whitcup,

Defendants

And

QUESTCOR PHARMACEUTICALS, INC., a California Corporation

Nominal Party

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Clarence C. Farmer, Jr., Derivatively on behalf of Questcor Pharmaceuticals, Inc.

**DEFENDANTS**
Don M. Bailey, see attachment for add'l defendants

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Kathleen A. Herkenhoff, THE WEISER LAW FIRM, P.C.
12707 High Bluff Drive, # 200, San Diego, CA 92130
Phone: 858-794-1441

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Jurisdictionally under U.S.C. Sec 1332(a)(2) and Jurisdictionally under U.S.C. Sec 1367(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:    Case Number:** _SACV 12 - 02019 DOC (RNBx)_

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): SACV12-01716DMG(FMOx), SACV12-01718DMG(FMOx),SACV12-01753DMG(FMOx),SACV12-01754DMG(FMOx)
SACV12-01759DMG(FMOx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
  ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
  ☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Pennsylvania |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
  ☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | San Mateo County, San Diego, New York, Florida |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _Kathleen M Hazlett_   Date: 11-20-2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

ATTACHMENT "A" TO CIVIL CASE COVER SHEET   (Defendants)

Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Neal C. Bradsher, Stephen C. Farrell, Louis E. Silverman and Scott M. Whitcup,

Defendants

And

QUESTCOR PHARMACEUTICALS, INC., a California Corporation

Nominal Party